IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| THE WALLING COMPANY LLC, | |
| Plaintiff, | **8:25CV294** |
| vs. | |
| SCOTT KESTERSON, MARY KESTERSON, ANDY DALY, CURT DOWDING, MITCH MCKNIGHT, and HEAT EXCHANGER GROUP, INC., | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the Court on The Walling Company's Motion for a Preliminary Injunction (Filing No. 37).

Back in November, several employees left The Walling Company and joined the Heat Exchanger Group. In response, The Walling Company sued—first in state court then in federal court—under a panoply of legal theories.

The Court takes several paths through the thicket of claims. Some—like a breach of contract claim based on an invalid restrictive covenant—are unlikely to succeed on the merits. Others—like a breach of loyalty claim based on past misconduct—do not establish irreparable harm. All are colored by The Walling Company's delay in seeking injunctive relief. All these paths lead to the same place: The Walling Company is not entitled to the extraordinary remedy of a preliminary injunction.

## BACKGROUND

This is a dispute arising from a group of employees who left one company in the industrial pump industry—The Walling Company—for another—The Heat Exchanger Group.

A. **The Parties, Their Industry, Their Employment, and Their Restrictive Covenants.**

This case arises from the industrial pump industry.  For context, manufacturers of industrial machinery—pumps in this case—do not sell directly to the factories that use the pump.  Filing No. 40-1 at 5.  Instead, the manufacturers sell their pumps to factories through intermediaries.  *Id.*  Those intermediaries sell equipment to factories and perform service for the life of the pump.  *Id.*  To succeed in the industry, the intermediary needs to understand both the product (*i.e.*, the technical specifications of the pump) and the customer (i.e., the specific needs of a given factory).  *Id.* at 7–8.

*The Walling Company.*  The Walling Company, a Nebraska corporation, is one of those intermediaries.  The Walling Company is a diversified industrial equipment supplier.  *Id.* at 5.  Two of its lines of business are industrial pumps and fire suppression systems.  *Id.*  It maintains relationships with manufacturers and end users of industrial equipment.  *Id.* at 5–6.  The Walling Company operates throughout the Midwest.  *Id.* at 6–7.  For many years, it operated as a family-owned company.  In 2023, it was purchased by a private equity company.

*The Heat Exchanger Group.*  The Heat Exchange Group, a Texas corporation, is both manufacturers heat exchangers[1] and sells other industrial equipment, including pumps.  Filing No. 52 at 2–3.  The Heat Exchanger Group and The Walling Company are no strangers.  *Id.* at 5–6.  The Heat Exchanger Group works in the same market as The Walling Company with many of the same customers.  *Id.* at 2.  At various times, the Heat Exchanger Group has acted as both a supplier and a maintenance service provider for

---

[1] A heat exchanger is exactly what it sounds like—a type of industrial equipment that absorbs and transfers heat from one location in the factory to another. This ensures that other machinery can be kept at a safe and effective temperature.

2

The Walling Company.  *Id.* at 3–4.  In 2023 and 2024, The Walling Company paid over $100,000 in commission payments to the Heat Exchanger Group for these maintenance services.  *Id.* at 5.

*Scott Kesterson.*   Scott Kesterson was a general manager for The Walling Company's Ankeny, Iowa office.  Filing No. 40-1 at 15–16.  He worked in sales from 2015 to 2024.  *Id.* His primary product line was fire pumps.  *Id.* He signed a Confidentiality, Loyalty, Noncompetition, and Inventions Agreement.  Filing No. 43.  Relevant here, this contract contained a non-solicitation provision.  This is the provision:

3.    **Post-Employment Customer and Employee Covenants.**

**Customers.**  For a period of one (1) year immediately following termination (for any or no reason) of employment with Company, Employee will not (directly or indirectly, on Employee's own behalf or in association with any other individual or entity) seek or accept employment with, and will not call on or solicit the business of, or sell to, or service, any of Company's customers with whom Employee did business and had personal contact while employed by Company, except to the extent such activities are for an individual or entity that is not in competition with Company and such activities cannot adversely affect Company's relationship or volume of business with such customers.  Employee specifically acknowledges that this restriction is necessary and reasonable for the protection of Company's goodwill and that it will not prevent Employee from being gainfully employed following termination of employment with Company, because Employee will be free to engage in any occupation, and even compete with Company, as long as Employee honors the restrictions contained in this paragraph concerning Company's aforementioned customers.

**Employees.**  For a period of one (1) year immediately following termination (for any or no reason) of employment with Company, Employee will not (directly or indirectly, on Employee's own behalf or in association with any other individual or entity) solicit for employment, hire, or recommend for hiring, any employee of Company with whom Employee worked and had personal contact while employed by Company.  Employee specifically acknowledges that this restriction is necessary and reasonable for the protection of Company's employee goodwill and that it will not prevent Employee from being gainfully employed following termination of employment with Company, because Employee will be free to engage in any occupation, and even to solicit Company's employees, as long as Employee honors the restrictions contained in this paragraph concerning Company's aforementioned employees.

Employee agrees that any violation of the aforementioned customer or employee covenants shall automatically result in an extension of such covenant with respect to the customer or employee involved on the same terms and conditions for an additional period of time equal to the time that elapses from the commencement of such violation to the later of (a) the termination of such violation; or (b) the final resolution of any litigation stemming from such violation.  Employee authorizes Company to provide a copy of this Agreement to any entity or individual

2

who, in the future, hires, affiliates with, or considers hiring or affiliating with Employee.

Filing No. 43 at 31–32. Unlike his colleagues, Scott Kesterson did not use a Walling Company laptop. Filing No. 47-2 at 3–4. Instead, with his manager's approval, he used his personal MacBook computer. *Id.* In May 2024, he ran out of space on his laptop and backed up a combination of personal and work files to an external hard drive. *Id.* at 4. This hard drive plays a central role in the drama to come.

*Mary Kesterson.* Mary Kesterson worked for The Walling Company in a "sales centric" role starting in 2016. Filing No. 40-1 at 4. She worked on a Walling Company laptop, which she returned at the conclusion of her employment. Filing No. 47-3. She did not sign any employment contract containing restrictive covenants. *Id.*

*Curt Dowding.* Dowding worked for The Walling Company as a heat exchanger and industrial pump salesman from 2021 to 2024. Filing No. 40-1 at 4. He is a twenty-five-year veteran of the industrial equipment sales industry and came to The Walling Company with extensive industry knowledge. Filing No. 50-1 at 1–2. In the role, he worked with factories to meet their industrial equipment needs. *Id.* Dowding used a Walling Company laptop during his employment. *Id.* At various times, including October 2024, he backed up information from his company laptop to a Seagate external hard drive. *Id.* at 2. The hard drive and its metadata will be discussed *infra* Section Background B. In 2021, Dowding signed a Confidentiality, Loyalty, Noncompetition, and Inventions Agreement. Filing No. 43 at 45. This contract contained the same noncompete provision as Scott Kesterson's contract. *Id.* at 43–44.

*Andy Daly.* Daly worked for The Walling Company as a heat exchanger salesman from 2022 to 2024. Filing No. 50-3 at 2–3. He joined The Walling Company after working in the industry for many years and brought several long-term clients along. *Id.* He signed

a noncompete agreement. Filing No. 55. His noncompete differs from the contract signed by Scott Kesterson and Dowding. Like those contracts, Daly's noncompete bar solicitation for one year after his employment. *Id.* But, his contract does not contain the automatic extension language. *Id.*

*Mitch McKnight.* Mitch McKnight is a service technician for industrial pumps and fire systems. Filing No. 50-2 at 2. He has worked in the industry for three decades. He worked at The Walling Company from 2016 to 2024. *Id.* His job was "90% labor, servicing, and providing maintenance to fire systems." *Id.* McKnight did not have an employment contract. He used a Walling Company laptop during his employment. *Id.* The Walling Company alleges but has shown no evidence that he retained company information on his personal devices. *Id.*

The Court will refer to the individual Defendants collectively as "the former employees."

**B. The Former Employees Leave The Walling Company and Join the Heat Exchanger Group.**

In October and November 2024, the former employees left their employment at The Walling Company and assumed similar roles at the Heat Exchanger Group. Filing No. 40-1 at 15. Specifically, they worked selling both heat exchangers and started a pump-centric line of business for the Heat Exchanger Group. In the following months, several manufacturers stopped working with The Walling Company and started using The Heat Exchanger Group as their distributor. *Id.* at 38. The ones who stayed with The Walling Company appeared to shift their business to The Heat Exchanger Group. *Id.* Without these manufacturers, "TWC has also lost nearly the entirety of its industrial pump and fire pump business." *Id.* at 39. The Walling Company blames the former employees

and asserts their actions were not just sharp business practices but an illegal scheme "carefully orchestrated to inflict maximum damage on TWC." Filing No. 38 at 6.

There are a lot of people and issues involved in this litigation. The Walling Company's briefing has not been the model of clarity, often attributing actions to Defendants as a lumped together mass engaging in a lumped together scheme. To specifically address The Walling Company's likelihood of success on the merits, it is useful to break up the alleged wrongs of each defendant.

*Scott Kesterson.* The Walling Company focuses on two general categories of alleged wrongs: (1) solicitation of Walling Company customers, and (2) retention and use of Walling Company information.

In support of the competition-related allegations, The Walling Company produced text messages in which Scott Kesterson discussed plans to move Walling Company clients over to the Heat Exchanger Group. Filing No. 40-1 at 16–19. Specifically, the texts suggests that Scott Kesterson told current Walling Company clients that he was planning to leave the company and inviting them to follow him to the Heat Exchanger Group. *Id.* During that time, Scott Kesterson set up a Heat Exchanger Group email and prepared business cards. *Id.* Overall, it appears during late October, Scott Kesterson was getting a head start on his competing venture. *Id.* The Walling Company contends this violates the terms of his noncompete, breached his common law duty of loyalty, and amounted to tortious interference with The Walling Company's contracts with manufacturers.

The information-related allegations fall into three buckets:

6

- Emails retained on Scott Kesterson's MacBook. Filing No. 40-1 at 31–32. After leaving The Walling Company, Scott Kesterson's email inbox was not wiped from his MacBook, and the address remained in his desktop email client. Filing No. 47-2 at 5–10. During December 2024, several draft emails were associated with The Walling Company email address. *Id.* These same emails were later completed and sent through Scott Kesterson's Heat Exchanger Group email. *Id.* Scott Kesterson's MacBook, along with the email folder, has been located with his counsel, since February. Filing No. 47-1 at 4.

- A "business plan." In December, Scott Kesterson drafted a promotional business plan for A.R. Wilfley & Sons, a Walling Company manufacturer. Filing No. 40-1 at 21–22. The Walling Company contends portions of this business plan were copied from an undisclosed Walling Company document. *Id.*

- Documents contained on Scott Kesterson's hard drive. Filing No. 40-1 at 25–30. As previously discussed, Scott Kesterson backed up files from his computer to an external hard drive. Filing No. 47-2 at 4. This included sensitive sales and customer data, discussed *infra* Section II.C.1.a. Scott Kesterson contends that the metadata shows the files were last accessed in May 2024—the date of the earlier backup. Filing No. 47-2 at 4. Scott Kesterson turned the hard drive over to his attorney in February 2025 and it has been in counsel's possession since. *Id.*

7

The Walling Company contends that some, if not all, of this information is a trade secret and Scott Kesterson used it on behalf of the Heat Exchanger Group. Moreover, The Walling Company contends, the email-related allegations suggest a violation of two computer hacking statutes.

*Mary Kesterson*. Mary Kesterson's alleged misdeeds break down along the same lines. On the competition side, Mary Kesterson appears on some emails discussing the former employee's intent to flip Walling Company customers and may have attended meetings with Walling Company customers. *See* Filing No. 40-1 at 33–34. On the information side, at some point in September 2024, Mary Kesterson appears to have downloaded fourteen files to a flash drive. Filing No. 40-2. The file names are redacted, and The Walling Company does not explain the contents of the specific files. *Id.* This flash drive dropped out of the picture in The Walling Company's preliminary injunction briefing, and Mary Kesterson submitted sworn testimony that she no longer possesses any Walling Company information after returning her laptop. Filing No. 47-3. The Walling Company claims these actions violate the trade secret laws, breached the common law duty of loyalty, and amounted to tortious interference.

*Curt Dowding.* Dowding's conduct involves both the competition and information issues. On the competition side, he was copied on several text messages with Scott Kesterson, including one in which Scott Kesterson refers to "taking lines"—presumably lines of business, presumably from The Walling Company. Filing No. 40-1 at 18–20. On the information side, Dowding backed up work files to an external hard drive. Filing No. 40-2. The contents of his hard drive are discussed *infra* Section II.C.1.a. Dowding turned his hard drive over to his attorney in December 2024. Filing No. 50-1 at 3. The hard drive

8

and its files have been in the possession of counsel and his retained expert since. *Id.* A report prepared by Dowding's expert indicates the files in question have not been accessed since November 1, 2024—before Dowding left The Walling Company. Filing No. 50-4. The Walling Company claims these actions violate the trade secret laws, breached the common law duty of loyalty, and amounted to tortious interference.

*Andy Daly.* Daly's alleged wrongdoing involves both the competition and information issues. On the competition side, Daly forwarded along emails from certain clients to The Heat Exchanger Group. Filing No. 40-1 at 32–33. The nature of these emails is unclear. *See* Filing No. 40-1 at 49–75 (redacting the substantive information). The Walling Company claims Daly was siphoning off clients in preparation for his departure. Daly claims he was referring clients for maintenance service in connection with an existing relationship between the two companies.[2] Filing No. 52-1; Filing No. 50-3. Moreover, Daly submitted a declaration affirming he was not involved in flipping any Walling Company customers after joining the Heat Exchanger Group. Filing No. 50-3 at 5. The Walling Company also claims these emails contain trade secret information. Daly returned his computer to The Walling Company and has not had access to his email since. The Walling Company claims these actions violated his noncompete, breached his duty of loyalty, and ran afoul of the trade secret laws.

*Mitch McKnight.* McKnight's alleged wrongdoing falls into the competition bucket.[3] Specifically, in the final months of his employment, text messages suggest McKnight informed several clients that he was planning to leave and join the Heat Exchanger Group.

---

[2] The details of this fact dispute are convoluted and mostly irrelevant to the resolution of this motion.
[3] The Walling Company's complaint claims McKnight took trade secret information. It has not offered any evidence to support that assertion.

Filing No. 40-1 at 16–18, 35–36; Filing No. 50-2.   He also discussed obtaining Heat Exchanger Group business cards to give to his preferred customers.  Filing No. 40-1 at 36.   The Walling Company claims these actions breached his duty of loyalty and amounted to tortious inference.

*The Heat Exchanger Group.*  According to The Walling Company, the malfeasance of the former employees is imputed onto The Heat Exchanger Group.  Specifically, The Walling Company asserts The Heat Exchanger Group took advantage of the former employees' breaches of their duties of loyalty or contractual noncompete provisions.  And The Heat Exchanger Group used The Walling Company's trade secret information to take its clients.  According to The Walling Company this amounts to tortious interference of contract and a violation of the trade secret laws.

## C. This Litigation

This litigation has proceeded in fits and starts across state and federal court over the past eight months.  In mid-November, The Walling Company sent cease and desist letters to the former employees.  *See* Filing No. 47-1 at 7–17 (Kestersons); Filing No. 40-1 at 86–98 (Dowding, Daly, and McKnight). These letters articulated The Walling Company's theory of the case: that the Defendants engaged in illegal competition and used The Walling Company's trade secrets.  The Walling Company did not move for a preliminary injunction in November.

In December, Defendants offered to return any Walling Company documents and image their devices.  *See* Filing No. 47-1 at 18; Filing No. 50-5 at 8–11. These early efforts to resolve the dispute broke down and The Walling Company sued in state court on December 16, 2024.  Filing No. 47-1 at 19–56 In its state court complaint, The Walling

Company raises contract, trade secret, and tortious interference claims based on the same underlying conduct at issue here. *Id.* at 38–55. The Walling Company also made allegations of irreparable harm. *Id.* at 36–38. The Walling Company did not move for a preliminary injunction in December.

In January and February, the Parties prepared to mediate their dispute. During this period Scott Kesterson and Dowding's devices were mailed to a third-party expert for imaging. Filing No. 50-5; Filing No. 47-2 at 4. Defendants provided these reports, along with their text messages and other written discovery, to The Walling Company in advance of mediation. Filing No. 47-1 at 3–4. Mediation was unsuccessful. *Id.* at 4. The Walling Company did not move for a preliminary injunction in January or February.

In March, The Walling Company scheduled a preliminary injunction hearing in state court. Filing No. 50-5 at 5–6. But they never submitted a motion and canceled the hearing. *Id.* at 5–6, 61–62. Later, Scott Kesterson's counsel provided The Walling Company with copies of all Walling Company data in his possession. Filing No. 47-1 at 101–102. The Parties continued to exchange discovery in the state court action through April. In mid-April, the state court indicated it was going to dismiss the state court action because there was no activity in the case. Filing No. 47-1 at 5. The Walling Company did not move for a preliminary injunction in March or April.

Instead, The Walling Company voluntarily dismissed the state court action and filed this lawsuit on April 22, 2025. Filing No. 1. It raised substantially the same claims as those at issue in the state court action and added a federal trade secret claim and claims under two federal statutes. *Compare* Filing No. 47-1 at 57–98 (amended state court complaint) *with* Filing No. 1 (federal complaint). The Walling Company represented that it

intended to move for a preliminary injunction within 60 days of filing. Filing No. 50-5 at 63. In fact, The Walling Company did not move for a preliminary injunction within 60 days or at all in April or May.

Instead, in June the Parties fully briefed three motions to dismiss. Filing No. 16; Filing No. 20; Filing No. 24. Those motions have been ripe since June 25. The Walling Company did not move for a preliminary injunction in June.

Finally, on July 9, 2025, The Walling Company moved for a preliminary injunction. Filing No. 37. A week later, The Court held oral argument. Filing No. 59 (text order). Three weeks later, The Court issued this opinion. It has been nine months since the former employees left The Walling Company and joined The Heat Exchanger Group.

The Court has federal question jurisdiction over this dispute under 28 U.S.C. § 1331 because The Walling Company sued under the federal Defend Trade Secrets Act (18 U.S.C. §§ 1836–1839), Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030), and Stored Communication Act (SCA) (18 U.S.C. § 2510). The Court has supplemental jurisdiction over The Walling Company's state law claims under 28 U.S.C. § 1367 because they are "part of the same case or controversy" as The Walling Company's federal claim.

## LEGAL STANDARD

Fed. R. Civ. P. 65 governs the issuance of preliminary injunctive relief. In deciding whether to issue a preliminary injunction, the Court considers: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc),

"A preliminary injunction is an extraordinary remedy [and] never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Consequently, a court must be "mindful that a movant carries a 'heavier' burden when granting a preliminary injunction has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)).

The "most important" factor is The Walling Company's likelihood of success on the merits.  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).  In this posture, it "must show that it has at least a 'fair chance of prevailing.'" *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1014 (8th Cir. 2021) (quoting *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

Even if The Walling Company shows a fair chance of success on the merits, "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996)). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."

13

*Miller*, 9 F.4th at 1015 (quoting *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018)).

Nebraska substantive law governs The Walling Company's state law claims.[4]  *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). In analyzing The Walling Company's state law claims the Court is "bound in [its] interpretations of Nebraska law by the decisions of the Nebraska Supreme Court." *Packard v. Darveau*, 759 F.3d 897, 901 (8th Cir. 2014) (quoting *Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.*, 118 F.3d 1263, 1267 (8th Cir. 1997). If the Nebraska Supreme Court has not considered an issue, the Court must "predict what the court would decide if it were to address the issue" based on "relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." *Id.* (internal quotations omitted).

### DISCUSSION[5]

The Walling Company is not entitled to a preliminary injunction for two independent reasons. First, its delay in seeking emergency relief left no status quo to maintain. Second, analyzing each claim without regard to the delay, a preliminary injunction is unwarranted. Specifically, The Walling Company failed to show a fair chance of success on most of its claims. For its two claims—breach of the employees' duty of loyalty and Daly's breach of contract—for which it showed a fair chance of success it did not establish irreparable harm.

---

[4] The Parties appear to agree Nebraska law applies, so, in this preliminary posture, the Court applies Nebraska law.

[5] The Walling Company does not rely on, and the Court does not address the following claims: Count V Breach of Contract—the Phantom Equity Agreement, Count XIV Aiding and Abetting, Count XV Civil Conspiracy, Count XVII Nebraska Consumer Protection Act, Count XVIII Nebraska Uniform Deceptive Trade Practices Act, and Count XIX Unjust Enrichment.

The Court proceeds in the following order: First, it discusses the impact of The Walling Company's delay on its showing of irreparable harm. Second, it goes claim by claim and discusses The Walling Company's showing on the merits and irreparable harm. Third, it discusses the balance of the equities and the public interest.

## I.    Irreparable Harm: All Claims, All Parties

A specter looms over this case: The Walling Company's delay in seeking injunctive relief.

Eighth Circuit law is clear: delay in seeking a preliminary injunction may result in denial of a preliminary injunction. "[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary injunction.'" *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) (citation omitted); *Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805 (8th Cir. 2021) (*quoting* Wright & Miller, § 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 & n.13 (3d ed. 2013)) ("A long delay by plaintiff after learning of a threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.")

The Walling Company was unreasonably dilatory in seeking a preliminary injunction. Whether a delay is unreasonable turns on the context of the dispute and the nature of the injury. *Ng*, 64 F.4th at 998–99. Here, the employees left the company in December 2024. The Walling Company started losing clients and manufacturers to The Heat Exchanger group in January. Filing No. 40-1 at 37–38. That same month, it determined Scott Kesterson and Dowding had Walling Company information. Against this

backdrop, it filed suit in state court. In the four months this case was in state court, The Walling Company never moved for preliminary relief. Indeed, it scheduled a preliminary injunction hearing—only to dismiss without submitting a motion or briefing. Then, The Walling Company chose to dismiss the state court action and move to federal court. Once in federal court, it waited an additional three months to move for a preliminary injunction. The Court has trouble accepting The Walling Company's assertions of imminent and irreparable harm when it dilly dallied for eight months, all while knowing of the injuries it now claims are irreparable.

Certainly, a lengthy delay alone does not defeat irreparable harm—*Ng*, 64 F.4th at 998—but this delay had consequences. "[D]elay is only is only significant if the harm has occurred and the parties cannot be returned to the status quo." *Id*. *Ng* is instructive. There, a gymnast sued his university because the university dissolved the gymnastics program. *Id*. at 995. But he waited thirteen months to ask for a preliminary injunction. *Id*. at 996. During those thirteen months, the coaches and other gymnasts left the university, so it was impossible for the university to field a team. *Id*. at 998. Against that backdrop, the Eighth Circuit affirmed the denial of a preliminary injunction "[b]ecause Ng sought an injunction after it would have been possible 'to preserve the status quo.'" *Id*. Same here. While The Walling Company waited to request a preliminary injunction, "TWC . . . lost nearly all its fire pump business and revenue." Filing No. 40-1 at 39. After the customers and manufacturers left, The Walling Company built its salesforce back up and this new salesforce has been in place for multiple cycles. Filing No. 54 at 7–10. While the Court could theoretically order the defendants to stop contacting Walling Company clients and manufacturers, it cannot order lost clients or manufacturers to return. Nor can

16

it order the customers to rewire their brains to replace the goodwill lost by the former employees' solicitation. Nor does it make sense—as The Walling Company suggested at the preliminary injunction hearing—to issue an injunction to allow The Walling Company's new salespeople in to make their pitch. Filing No. 60 at 10. These employees have been in place for a sales cycle and The Walling Company has not shown they are unable to meet customer needs. *See id.* at 11 (indicating the sales cycle in this industry is "around three months"). Assuming this type of relief is *ever* appropriate, it certainly is not here. *Compare W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 927 F. Supp. 2d 776, 787–88 (D. Neb. 2013) (issuing a two-month injunction to allow plaintiff to rebuild its sales staff when plaintiff sued three days after the employee's departure). Put another way, The Walling Company stood around while the cows left the barn and the Court, closing the door now, cannot bring them back.

Same for the trade secrets claim. The purported trade secrets were taken back in November. In December at the earliest and February at the latest, the former employees' lawyers took possession of the hard drives. The Walling Company did not seek an injunction in November, December, or January to get back its files. Instead, Scott Kesterson and Dowding have spent months trying to return these files to The Walling Company. So, the passage of time gave The Walling Company what it wanted: the former employees no longer possess its information. It is unclear what entering an injunction now would accomplish.

To summarize: a preliminary injunction is inappropriate ""[b]ecause" The Walling Company "sought an injunction after it would have been possible 'to preserve the status quo.'" *Ng*, 64 F.4th at 998.

17

In response, The Walling Company argues they were methodically building up their case and moved for a preliminary injunction after new evidence came to light in pre-mediation document exchange. *See* Filing No. 53 at 14. The Court is not convinced for three reasons.

One, The Walling Company delayed an additional three months in federal court–briefing three separate motions to dismiss—without asking for any emergency relief. So, the pattern of delay continued after this game changing new evidence came to light.

Two, The Walling Company raised virtually the same allegations of breached noncompetes and retained trade secrets in its original state court complaint. And the employee text messages were disclosed as far back as February. The Walling Company is cagey about what new information came to light between February and July that transformed its state law trade secret claim into an injunction-worthy federal trade secrets claim. It appears The Walling Company has been on notice of the basis for its injunction since March at the latest. Thus, the Court cannot say that the state court discovery changed the game enough to justify The Walling Company's delay.

Three, even accepting The Walling Company was marshaling its case for a preliminary injunction throughout the past eight months, it does not change the bottom line: The Walling Company still sat on its hands while its customers left, and the former employees held Walling Company information. Methodical preparation over eight months is inconsistent with The Walling Company's assertion that existential harm is going to happen to its business in the next instant. So, even accepting that The Walling Company was diligently preparing its motion papers, the time it took to ask for relief suggests either the harm is not as existential or as imminent as it now suggests.

The Walling Company waited eight months to seek an injunction.  During those eight months, the status quo disappeared.  Against this backdrop "it is not entirely clear how injunctive relief would actually assist [The Walling Company] in any manner." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009).  This delay undermines The Walling Company's assertions of irreparable harm.  The Walling Company's unreasonable delay is sufficient to deny its motion for preliminary injunction. *Ng*, 64 F.4th at 999.

## II.    Likelihood of Success on the Merits and Irreparable Harm: Individual Claims

Even if The Walling Company's delay was reasonable or there was still a status quo to preserve, it has not shown it has a fair chance of prevailing on the merits of its claims or that it will suffer irreparable harm in the absence of an injunction.  The Court takes up those issues below.

### A.  Breach of Contract (Scott Kesterson, Daly, and Dowding)[6]

The Walling Company is unlikely to succeed on the merits of its breach of contract claim against Scott Kesterson and Dowding because its restrictive covenants are likely unenforceable under Nebraska law.  Its claims of irreparable harm are belied by its focus on past harm and failure to explain why its injuries cannot be remedied by lost profit damages.

---

[6] Mary Kesterson and McKnight do not sign noncompete agreements with The Walling Company. At times, The Walling Company seems to suggest they are bound by certain provisions in their employee handbook. But the handbook is clear: "[N]othing in this Handbook is to be interpreted as a contract, expressed or implied . . .." Filing No. 43 at 26. And "[w]here an employee handbook expressly states that it creates no contractual obligations," the Nebraska Supreme Court "refuse[s] to treat it as creating any such obligations." *Armstrong v. Clarkson Coll.*, 901 N.W.2d 1, 17 (Neb. 2017).  The Walling Company has pointed to no contractual relationship with The Heat Exchanger Group. Without a contract, The Walling Company is unlikely to succeed on its contract claim against these defendants.

The analysis is different for Daly. Daly's contract does not contain the problematic language that doomed the Kesterson and Dowding restrictive covenants. And, while the record is mixed, The Walling Company has shown some possibility of breach. However, its evidence of breach is stale accounts of past harm and speculative and conclusory assertions of future harm. So, while a closer call, the breach of contract claim against Daly does not entitle The Walling Company to a preliminary injunction.

### 1. Likelihood of Success on the Merits (Scott Kesterson and Dowding)

The Walling Company is unlikely to succeed on the merits of its contract claim against Scott Kesterson and Dowding.

Under Nebraska law, a claim for breach of contract requires showing: (1) a valid promise, (2) a breach of that promise, (3) damages, and (4) compliance with any conditions' precedent. *See Ryan v. Streck, Inc.*, 958 N.W.2d 703, 710 (Neb. 2021). Here, Scott Kesterson and Dowding focus on the first element and argue the noncompete provisions of their employment contracts are invalid and unenforceable. Likewise, The Walling Company focuses the bulk of its attention on the non-solicitation provisions of the employment contracts. The Court does the same.[7]

Under Nebraska law—like the law of many states—restraints on trade are disfavored. *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014); Neb. Rev. Stat. § 59-1603 ("Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful"). In other words, the law

---

[7] In passing, The Walling Company claims defendants breached the confidentiality provisions of the contracts. Assuming Dowding and Scott Kesterson's retention of company documents on their hard drives breached the confidentiality provisions, The Walling Company has not shown irreparable harm. *See infra* Section II.C.2 (deciding The Walling Company did not show irreparable harm on its trade secret claim).

prefers a competitive market and looks askance at covenants that stifle that competition. But—recognizing companies have legitimate interest in maintaining their proprietary information and goodwill—Nebraska courts allow limited restrictive covenants for departing employees. *Gaver*, 856 N.W.2d at 127.  A valid restrictive covenant is "(1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee." *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 628 (Neb. 2008).  To succeed on the second prong, The Walling Company must show its restrictive covenants "contain[] reasonable temporal and geographic restrictions." *Gaver*, 856 N.W.2d at 128.  Overall, an enforceable restrictive covenant is one that is "reasonable in both space and time such that the restraint imposed will be no greater than necessary to achieve its legitimate purpose." *Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 443 (Neb. 2015).  This second prong is dispositive.

The restrictive covenants here—which are uncertain in duration—are likely invalid under Nebraska law.  Here, the contract sets a default one year time limitation.  But, "any violation of the aforementioned customer or employee covenants shall automatically result in an extension of such covenant with respect to the customer or employee involved on the same terms and conditions for an additional period of time equal to the time that elapses from the commencement of the violation to the later of (a) the termination of such violation; or (b) the final resolution of any litigation stemming from such violation."  Filing No. 43 at 43.  This is a problem.  Rather than having a fixed end date an employee can plan her affairs around, the length of the noncompete varies depending on whether the

21

employer chooses to sue.  Litigation is time consuming, and cases can take years to reach finality, especially if the employee disputes that a violation has occurred.  So, by filing suit and declining to settle an employer could theoretically extend the life of its noncompete by four or five years.  Thus, the noncompete is not tailored to the employer's legitimate interests, but its litigation choices.  And, because the length of the extension is the later of the termination of the violation or the end of litigation, the end date of noncompete provision is outside the employee's hands.  Moreover, if an employee is sued, she faces a Schrödinger's cat[8] dilemma.  Either: (1) the judge or jury finds a violation and the noncompete expands to fill the past five years, or (2) the judge or jury finds no violation and the noncompete was not in force during the past five years.  Thus, the length of this noncompete is ascertainable only in hindsight based on The Walling Company's litigation choices.  This is not a "reasonable temporal . . . restriction[]," *Gaver*, 856 N.W.2d at 128, because its effective life is "greater than necessary to achieve its legitimate purpose." *Unlimited Opportunity, Inc.*, 861 N.W.2d at 443.

While the Nebraska Supreme Court has not addressed this issue, this reasoning is consistent with other jurisdictions who have invalidated similar provisions.  *See e.g. H & R Block E. Enters., Inc. v. Swenson*, 745 N.W.2d 421, 423 (Wis. Ct. App. 2007) (invalidating a similar provision because "[t]he effect of the extension provision thus makes the duration of the restraint not a fixed and definite time period but a time period that is contingent upon outcomes the employee cannot predict"); *Hanson v. Loparex, Inc.*,

---

[8] Schrödinger's cat is a thought experiment illustrating the oddities of subatomic physics in which a cat in a box exists in two contradictory states—alive and dead—until observed. *See* Jim Baggott, T*he Cat That Won't Die*, Aeon (Apr. 28, 2025), https://aeon.co/essays/no-schrodingers-cat-is-not-alive-and-dead-at-the-same-time. Like the cat, the noncompete here is both in force and invalid during the pendency of the litigation.

809 F. Supp. 2d 972, 981 (D. Minn. 2011) (following *H&R Block E. Enters., Inc.*); *Doan Fam. Corp. v. Arnberger*, 522 P.3d 364, 373 (Kan. Ct. App. 2022) ("Practically speaking, the tolling provision could result in an unlimited restriction on a person's postemployment activities, making them liable to their former employer for lost profits in perpetuity."); *Wesley-Jessen, Inc. v. Armento*, 519 F. Supp. 1352, 1360 (N.D. Ga. 1981) ("The provision is unreasonable because if this provision were upheld, an employer could unilaterally extend the restrictive period simply by bringing an action seeking enforcement of this covenant."); *Cardinal Pers., Inc. v. Schneider*, 544 S.W.2d 845, 846–47 (Tex. Civ. App. 1976) (concluding a materially identical clause was "neither definite nor reasonable" and "unenforceable and void as contrary to public policy"); *Cent. States Logistics, Inc. v. BOC Trucking, LLC*, 573 S.W.3d 269, 277 (Tex. App. 2018) (same, more recently); *Cont'l Rsch. Corp. v. Scholz*, 595 S.W.2d 396, 402 (Mo. Ct. App. 1980) ("A survey of the authorities reveals that such automatic time extension provisions are almost uniformly disapproved."). The Walling Company has not identified authority from any jurisdiction going the other way or case law from the Nebraska Supreme Court suggesting it would take a different view of this issue.[9] So, in this posture, the Court predicts—based on persuasive authority from other jurisdictions and Nebraska law's suspicion of restrictive

---

[9] The Court's preliminary research identified several cases in which courts applied similar (but not identical) provisions, but none that squarely addressed the arguments advanced by Defendants here. *See e.g., Medtronic, Inc. v. Petitti*, No. A18-0010, 2018 WL 3520858, at *8 (Minn. Ct. App. July 23, 2018) (holding "[o]nce parties in a restrictive noncompetition agreement, which is to be strictly construed, agree about the scope of relief upon a court granting an injunction, courts cannot—in their discretion—disregard the contract language by *expanding* the scope of relief" without addressing the validity of the agreement); *Shepard & Assocs., Inc. v. Lokring Tech., LLC*, No. 1:20-CV-02488-PAB, 2022 WL 312711, at *40–41 (N.D. Ohio Feb. 2, 2022) (applying equitable tolling to a noncompete with a slightly different provision as a remedy, with no analysis of defendant's validity argument). The Court recognizes there may be more out there and welcomes any additional authority The Walling Company can muster on this issue as this litigation progresses.

covenants—the Nebraska Supreme Court would take a similar approach and invalidate this provision.

The Court cannot rewrite the restrictive covenants to sever the problematic portion and make them enforceable. Under Nebraska law, "it is not the function of the courts to reform a covenant not to compete in order to make it enforceable." *H & R Block Tax Servs., Inc. v. Circle A Enters., Inc.*, 693 N.W.2d 548, 552 (Neb. 2005); *Unlimited Opportunity, Inc.*, 861 N.W.2d at 441–42 (reaffirming Nebraska's minority approach to contract severability). This means a court cannot "employ[] the 'blue-pencil' rule" to carve out the unreasonable portion and "must either enforce it as written or not enforce it at all." *H & R Block Tax Services, Inc.*, 693 N.W.2d at 553. Thus, "if any portion of the covenant . . . is invalid, the remainder of the covenant is likewise invalid and unenforceable." *Id.* Here, the automatic extension clause is invalid. Contrary to The Walling Company's argument, the automatic extension clause and one year limit are part of a single unified restrictive covenant. Both clauses appear under a numbered heading titled "Post-Employment Customer and Employee Covenants"—showing an intent to create a unified restrict covenant. The automatic extension clause specifically operates on to the customer and employee covenants. Both provisions address the temporal scope of the noncompete and, thereby, "impose restrictions on the [employee's] post-termination competition." *H & R Block Tax Services, Inc.*, 693 N.W.2d at 553. The language, structure, and function of the two paragraphs show they contain "only one covenant not to compete." *Id.* Therefore, the Court must invalidate the provision as a whole and cannot "blue pencil" out the automatic extension clause to save the one-year restriction.

24

The Walling Company does not explain why this open-ended limitation is justified by its legitimate interests. Instead, it points to dicta from the Nebraska Supreme Court, suggesting a court may extend the life of a restrictive covenant as an equitable remedy. *See* Filing No. 38 at 14 (citing *Dunning v. Tallman*, 504 N.W.2d 85, 92 (Neb. 1993)). *Dunning* does not bear the weight The Walling Company puts on it for three reasons.

One, *Dunning* did not decide any of the issues in this case. *Dunning* held a court sitting in equity could not use civil contempt to enforce a judicially extended noncompete provision. 504 N.W.2d at 93. It did not involve a similar automatic extension period. *Id.* at 88 (reproducing the noncompete at issue). It did not even decide "whether an equity court is empowered to extend a noncompetition provision on breach of the provision." *Id.* at 93. So, *Dunning* does not establish that automatic extension provisions are enforceable or that the Court could choose to extend the term as an equitable remedy.

Two, assuming the Court has the power to equitably extend the term of a valid noncompete, the remedies Court can provide in equity is different from what parties can permissibly add include their contract. This question of remedy is downstream from the existence of a reasonable noncompete. *H & R Block Tax Servs.* explained the difference between these inquiries. 745 N.W.2d at 427–28. The reasonableness "determination focuses on the business of the employer, the interest it seeks to protect, and the position of the employee." *Id.* at 428. In contrast, the remedy determination "is a matter for the court's discretion; and the court takes into account factors such as the circumstances of the breach, the effect on the employer, and the inadequacy of monetary damages." *Id.* Moreover, in contrast to the automatic operation of the extension provision here, "[a]n employer is by no means entitled to an extension simply because there has been a

25

breach." *Id.*  So, just because extending a non-compete may be a remedy does not mean the automatic extension clause is necessarily valid.

Three, The Walling Company's comparison between the restrictive covenants and extending the life of a noncompete as an equitable remedy fails on its own terms.  As *Dunning* summarized courts who "utilized equitable power to extend a contractual noncompetition provision for a period beyond the agreed term when a party has violated the noncompetition provision . . . have reasoned that when one party has violated the noncompetition agreement during the prohibitory period, the other party is entitled to an extension of the agreement for a period equal to the duration of the breach so that the complying and injured party may be granted adequate equitable relief and made whole." 504 N.W.2d at 92 (collecting cases).  The noncompete provision here does not automatically extend "for a period equal to the duration of the breach."  *Id.*  Instead, it extends to "*the later of* (a) the termination of such violation; or (b) *the final resolution of any litigation* stemming from such violation." Filing No. 43 at 43 (emphasis added).  Thus, the noncompete here *automatically* extends the life of the noncompete beyond the term necessary to "be granted adequate equitable relief and made whole."  504 N.W.2d at 92. So, the automatic extension provision here, extends the life of the noncompete well beyond what The Walling Company could receive from a court as an equitable remedy.

Based on the current record and arguments, The Walling Company has not shown a fair chance of success on its contract claim against Scott Kesterson and Dowding because its restrictive covenants are likely unenforceable.

## 2. Likelihood of success on the merits (Daly)

Daly is a different story because his employment contract is materially different. Like the other Defendants, his noncompete bars him from soliciting clients he worked with personally at The Walling Company for a period of one year. But, unlike the other Defendants, his noncompete does not include the automatic extension provision. So, on this record and arguments, The Walling Company has a fair chance of showing Daly's noncompete is valid.[10] *See Pro. Bus. Servs., Co. v. Rosno*, 589 N.W.2d 826 (Neb. 1999) (approving a similar customer limitation); *Aon Consulting, Inc.*, 748 N.W.2d at 638–39 (approving a two year limitation).

The Walling Company has a fair chance of showing breach. Specifically, there are several instances, late in Daly's employment in which he directed Walling Company customers to the Heat Exchanger Group. These actions may run afoul of the contract's prohibition on "call[ing] on, solicit[ing] the business of, sell[ing] to, or conducting business with" a covered "Customer for the purpose of providing said Customer with products or services of the type . . . typically provided . . . by" The Walling Company. Filing No. 55 at 6. Daly denies this and argues he referred these clients according to an existing business relationship between The Walling Company and The Heat Exchanger Group. Here, the facts are undeveloped but based on the timing of the referrals, Baire's testimony that these referrals were not permitted, and Daly's subsequent jump over to the Heat Exchanger Group, The Court concludes The Walling Company has a fair chance of showing Daly breached the non-solicitation provision of his contract.

---

[10] Daly does not argue his noncompete is invalid. So, the Court's analysis is preliminary and does not foreclose Daly from making new arguments regarding the scope of his restrictive covenants as this litigation progresses.

### 3. Irreparable Harm

The Walling Company has not shown irreparable harm stemming from its contract claim against any Defendant.

The Walling Company has not shown irreparable harm because it relies on past conduct and has not shown a non-speculative possibility of imminent future harm. "The purpose of a preliminary injunction is not to remedy past harm." *Miller*, 9 F.4th at 1015. If "the harm to [The Walling Company] . . . has already occurred" damages—not a preliminary injunction—is the appropriate remedy. *CDI Energy Services*, 567 F.3d at 403. Here, the alleged improper competition has already occurred. The Court cannot use an injunction to return improperly solicited customers or manufacturers back to The Walling Company. This is especially true for Daly, who has a valid noncompete. The record shows a spurt of allegedly improper solicitations concentrated around Daly's departure in November. Filing No. 40-1 at 49–75. But, beyond speculation of its employee, The Walling Company has not offered evidence of current or imminent solicitation in violation of Daly's noncompete. They do not, for example, attach declarations by customers who have been solicited or recent communications between Daly and a covered customer. And Daly submitted sworn testimony indicating he complied with his employment agreement. Filing No. 50-3 at 5. So, the stale evidence of a breach that occurred in November—while potentially a basis for damages—is insufficient to support an injunction moving forward.

Moreover, on the current record, The Walling Company's losses appear compensable by money damages. As the Eighth Circuit has recognized, "'economic loss does not, in and of itself, constitute irreparable harm,' and . . . 'revenues and customers

28

lost to competition which can be regained through competition are not irreparable.'" *Iowa Utilities Bd.*, 109 F.3d at 426 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) and *Cent. & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C. Cir. 1985)). Indeed, a party's "claim of lost customer relationships" can be understood as "equivalent to a claim of lost profits." Here, The Walling Company has not shown any evidence that the lost profits from their business are uniquely difficult to quantify. Given money damages are available to rectify its injury, The Walling Company has not shown irreparable harm.

## B. Breach of the Duty of Loyalty (Scott Kesterson, Mary Kesterson, Dowding, Daly, and McKnight).

The Walling Company has shown a fair prospect of success on their breach of loyalty claim. But, under Nebraska law, the duty of loyalty terminates when the employment relationship ends. And a preliminary injunction exists to prevent future harm, not punish past conduct. So, even with a favorable showing on likelihood of success, the breach of loyalty claim does not entitle The Walling Company to a preliminary injunction.

### 1. Likelihood of Success on the Merits

The Walling Company has at least a fair chance of succeeding on their duty of loyalty claim. Under Nebraska law, even in the absence of a contract, an employee has a general duty of loyalty to their employer. *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1032 (8th Cir. 2020). An employee may "plan[] and prepare[] for a competing business" so long as the employee does not "not act in direct competition with his or her employer while still employed." *Dick v. Koski Pro. Grp., P.C.*, 950 N.W.2d 321, 367 (Neb. 2020), *opinion modified on denial of reh'g Dick v. Koski Pro. Grp., P.C.*, 953 N.W.2d 257 (Neb. 2021). Relevant here, an employee cannot siphon their employee's clients and

customers to a competing venture during her employment. *Id.* Here, while the factual record is mixed, text messages and emails preceding the employees' departure suggest they may have crossed the line from "preparing to compete" to directly competing. Specifically, in the weeks leading up to their departure, it appears certain customers were routed to the Heat Exchanger Group by the employees who would later join the Heat Exchanger Group. *See* Filing No. 40-1 at 15–33. Of course, The Heat Exchanger Group claims it acted as a maintenance service provider for some Walling Company customers during the relevant period. Filing No. 52-1. But The Walling Company has produced testimony that certain engagements were not authorized or part of this relationship. And it appears Scott Kesterson and McKnight informed some Walling Company customers, that they were leaving The Walling Company for The Heat Exchanger Group and some of the text messages raise circumstantial evidence of competition. Overall, there is circumstantial evidence that the former employees got a head start on their next venture while still employed by their first. There is much to sort out in discovery, but, at this preliminary juncture, The Walling Company has shown a fair chance of succeeding on its duty of loyalty claim.

### 2. Irreparable Harm

The Walling Company cannot show imminent irreparable harm because the Defendants' duty of loyalty expired when their employment ended. If "the harm to [The Walling Company] . . . has already occurred" damages—not a preliminary injunction—is the appropriate remedy. *CDI Energy Services*, 567 F.3d at 403. Here, the damage from the breach of the duty of loyalty has already occurred and will not recur. Specifically, the duty of loyalty expires as soon as an employee's employment ends. *Dick*, 950 N.W.2d at

370 (holding a jury instruction that stated "[a]n individual's fiduciary duty ends upon termination of the employment relationship" "correctly stated the law").  Here, none of the Defendants work for The Walling Company, owe no duty to The Walling Company, and cannot possibly breach any duty to The Walling Company in the future.  So, while The Walling Company may recover damages on its duty of loyalty claim, that theory does not support forward looking relief.  *See CDI Energy Services*, 567 F.3d at 402–03 (affirming district court who found likelihood of success on the merits of a breach of loyalty claim but no irreparable harm).

### C.  Trade Secrets

The Walling Company has not shown they are likely to succeed on its trade secrets claim.  It analyzes its trade secrets at a very general level where the law demands specificity.  Even if the Court could overlook these foundational problems, The Walling Company offers only speculation of misappropriation.  More importantly, the bulk of the alleged trade secrets are located on devices that are no longer in the Defendants' possession and have been offered to The Walling Company—undermining The Walling Company's claims of irreparable harm.

#### 1.  Likelihood of Success on the Merits

The Walling Company has not shown a likelihood of success on the merits on its trade secret claim. [11]  To succeed on its trade secret claim The Walling Company "must

---

[11] McKnight and Mary Kesterson can be dealt with summarily:

McKnight's computer was forensically imaged, but The Walling Company produced no evidence that he took any work files.  Indeed, in its reply brief, The Walling Company does not even attempt to argue McKnight misappropriated a trade secret. Filing No. 53 at 9–10.

Mary Kesterson's flash drive goes largely ignored by the Parties.  Like the hard drives, the file names are redacted and the descriptions of the files in Rob Barie's declaration are nonspecific discussions about the *folders* the files were taken from—not the files themselves. Filing No. 40-1 at 24. Moreover, The Walling Company offers no evidence she currently possesses the files, and she has offered sworn testimony that

show, among other things, the existence of a protectable trade secret and misappropriation of that trade secret." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020); 18 U.S.C. § 1863.[12] The Court addresses each in turn.

### a. Existence of a trade secret.

According to The Walling Company, everything under the sun is a trade secret but it has shown only a small sliver of that information—a few files on Scott Kesterson's hard drive—is likely to meet the statutory definition.

While The Walling Company uses the term "trade secret" synonymously with "confidential information," the applicable statutory definition is narrower. A trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if": (1) "the owner thereof has taken reasonable measures to keep such information secret," and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by,

---

she is not in possession of any Walling Company information and has not provided any to the Heat Exchanger Group. Moreover, in cataloging Mary Kesterson's wrongs in its reply brief, The Walling Company does not attempt to explain its trade secret claim. Filing No. 53 at 8–9. Against that backdrop, The Walling Company has not shown a likelihood of success of showing that Mary Kesterson misappropriated a trade secret.

[12] The Nebraska Trade Secrets Act shares common statutory language with the federal Defend Trade Secrets Act but its protections are narrower. *See Standard Nutrition Co. v. Smith*, No. 8:22CV46, 2024 WL 1162052, at *4 (D. Neb. Feb. 16, 2024); *First Express Servs. Grp., Inc. v. Easter*, 840 N.W.2d 465, 474 (Neb. 2013). The Court analyzes under the federal standard. Suffice to say, The Walling Company has failed to demonstrate a trade secret under the more demanding state law standard.

another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

The Walling Company relies throughout its briefing on a catch all category of "Confidential and Trade Secret Information." This is insufficient for showing likelihood of success on the merits because "[i]n order to successfully seek protection of a trade secret, a plaintiff must identify the trade secret with sufficient specificity so that appropriate relief may be granted." *CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 844 (D. Minn. 2007).  "Long lists of general areas of information containing unidentified trade secrets that the plaintiff intends to pursue at trial fail to identify the trade secret with sufficient particularity." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1089 (10th Cir. 2025).  Here, the complaint defines "Confidential and Trade Secret Information" as:

> *TWC's Confidential and Trade Secret Information*
>
> 35.    In addition to the Customer and Manufacturer information identified above, TWC's confidential and proprietary information also includes: TWC's business format and practices; TWC's pricing and commission policies, structures, formulas, and methods; quotes issued by TWC or on behalf of TWC; product schematics and models; TWC's know-how and operating practices; the terms and conditions of TWC's agreements with Manufacturers and Customers; information developed and maintained over the years relating to TWC's Customer names, key employees and decision-makers; Customers and Manufacturers' needs, operations,

6

---

> preferences, service and sales histories, current equipment and machinery in place, price structures, and other customer-specific information, including the know-how required to best provide services and customer-centric solutions to that Customer or Manufacturer; TWC's methods and systems to deliver services and products to its Customers and Manufacturers; TWC's marketing processes, strategies, and initiatives; TWC's business plans to pitch Manufacturers for relationships and territories; the manner in which TWC bids for Customer jobs and wins bids; TWC's customer, manufacturer, vendor, consultant, employee, independent contractor, temporary labor, supplier, distributor, and equipment lists, aggregated Customer and Manufacturer data and information, and TWC's sales programs, tools, forms, and processes (collectively, the "Confidential and Trade Secret Information").

33

Filing No. 1 at 6–7; Filing No. 38 at 3–4 (same in opening brief). This broad list—untethered to any existing documents in the record—precludes any meaningful analysis. *DatabaseUSA.com, LLC v. Van Gilder*, No. 8:17-CV-386, 2022 WL 2251665, at *6 (D. Neb. May 24, 2022). Indeed, The Walling Company does not attempt to explain how each individual category of information qualifies as a trade secret under 18 U.S.C. § 1839(3). Nor does it provide the Court with exemplars of the categories. This is unfortunate because trade secret protection for this kind of business information often turns on nuanced fact distinctions that The Walling Company's conclusory approach sandblasts away. *See* Malla Pollack, Callman on Unfair Competition, Trademarks, and Monopolies §§ 14:29, 14:30, & 14:31 (collecting cases coming to different conclusions regarding the type of business information encompassed in the complaint's definition); Roger M. Milgrim, 1 Milgrim on Trade Secrets §§ 1.09[7]-[8] (2025) (same). So, to the extent The Walling Company points to a bunch of stuff and asks the Court to trust it that there is an actionable trade secret somewhere in the pile, it has not shown a likelihood of success on the merits. Having rejected The Walling Company's broad definition, the Court turns to the categories that are developed with some specificity in The Walling Company's briefing.

*The Business Plan.* The first "trade secret" is a "business plan" that The Heat Exchanger Group "plagiarized."[13] Filing No. 54 at 8. *See* Filing No. 43 at 46–53. This does not meet the statutory definition.

---

[13] The Court notes that The Walling Company did not provide the original business plan so the Court cannot tell what portions were allegedly "plagiarized" or what steps, if any, The Walling Company took to maintain the document's secrecy.

*First*, it appears to be a brochure provided by The Heat Exchanger Group to A.R. Wilfley & Sons, a manufacturer. "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). The Walling Company has not indicated it required A.R. Wilfley & Sons to sign an NDA before reading its equivalent to this brochure or that there was any indication to A.R. Wilfley & Sons that the information was confidential. If The Walling Company provided this brochure to an outside audience, it did not "take[] reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(B).

*Second*, the brochure does not appear to contain "information" with "independent economic value, actual or potential, from not being generally known and not being readily ascertainable through proper means." 18 U.S.C. § 1839(3). The information about A.R. Wilfley & Sons includes its sales territories, products, and mission statement—all "readily ascertainable" by Google search. *Id.*; *see* Filing No. 43 at 51–53. And the business strategy portion boils down to use an inside and outside sales team who know the product, know the customers, and know the competitors to develop sales goals, market the product, and sell more products to new and existing customers. Filing No. 43 at 50–51. The trade secret laws do not protect information that can be found in every undergraduate business textbook. *See e.g.*, *Int'l Bus. Machines Corp. v. Visentin*, No. 11 CIV. 399 LAP, 2011 WL 672025, at *11 (S.D.N.Y. Feb. 16, 2011) *aff'd* 437 F. App'x 53 (2d Cir. 2011) (reaching a similar conclusion about a similar generic business information). So, while perhaps sharp business practices, plagiarizing another company's outward facing business plan is not a trade secrets violation.

*The Daly Emails.*  Another category of "trade secrets" are several emails forwarded by Daly to The Heat Exchanger Group.  The documents are heavily redacted, and The Walling Company has not made a specific argument why the redacted information meets the statutory definition of a trade secret.  The Court infers based on their witness testimony that the redactions include "quote and product needs" for certain customers (it is unclear whether the emails contain the quotes or are merely requests for a quote).  Filing No. 40-1 at 32–33.  Without knowing what the emails say, the Court cannot conclude the information contained in them meets the statutory definition of trade secret.

This is especially true, because The Heat Exchanger Group could ask the customer what model of equipment it uses, how much it pays for its current services, or what problems it is having with its equipment and learn the same information.  So, the Court fails to see why this information is "secret." [14] 18 U.S.C. § 1839(3).  Certainly, "[c]ompilations of non-secret and secret information" may qualify as trade secrets because "the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known."  *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011).  But, here, it appears The Walling Company expended minimal effort soliciting product needs from single customers.  Nor is there anything in the record suggesting the customer would be precluded from describing its product needs and how much it pays for them to any other salesperson.  While The Walling Company's witness testified that some of its manufacturers sign

---

[14] This category is especially tenuous under state law. *See First Express Services Group, Inc.*, 840 N.W.2d at 474 ("Nebraska's statute greatly narrows the definition of a trade secret: '[U]nder the literal terms of the . . . language, if an alleged trade secret is ascertainable at all by any means that are not 'improper,' the would-be secret is peremptorily excluded from coverage under the [Act].'") (quoting Gerald B. Buechler, Jr., *Revealing Nebraska's Trade Secrets Act*, 23 Creighton L. Rev. 323, 339 (1990)).

confidentiality agreements covering some of The Walling Company's information, it did

not produce any agreement covering these customers and this information.  Filing No.

40-1 ("Certain Manufacturers also required confidentiality provisions within their written

agreements with TWC.").  Thus, the Court cannot conclude—without more—that The

Walling Company will show the redacted information in the Daly email is "secret" and not

"readily ascertainable through proper means"—for example, by calling the customer.[15]  18

U.S.C. § 1839(3).

   *The Contents of the Dowding and Scott Kesterson Hard Drives.*  The contents of

the hard drives present similar difficulties.  The file names are redacted so it is difficult to

tell what kind of information they contain; let alone their economic value and what efforts

The Walling Company took to keep them secret.  *See* Filing No. 40-2 at 15–47.  And, the

files themselves are not before the Court, so all the Court has to go on is Barie's

description of the information some of the files might contain.  Basically, The Walling

Company is asking the Court to look at redacted screenshots of folder, "speculate about

the *descriptions* of the documents" in the folder "proffered by the parties and witnesses,"

and, from that spare record "decide for itself whether any of the data it contains was

ascertainable    by    proper    means    or    had    independent    economic    value."

*DatabaseUSA.com, LLC,* 2022 WL 2251665 at *8.  This approach is "deficient" and does

not establish a likelihood of success on the merits.  *Id.*

   Barie's descriptions of Dowding's files do not close the gap.  According to Barie,

the hard drive contains "files taken from various folders and 'Customer Files' for over 150

---

[15] Because The Walling Company has not shown a likelihood of success on the issue of whether the
information in the Daly emails contains a trade secret, the Court does not reach the thornier legal and
factual issues involved in deciding whether Daly's conduct rises to the level of misappropriation.

of TWC's business contacts, as well as files relating to TWC's Manufacturers[,] and included significant files relating to TWC's Confidential and Trade Secret Information." Filing No. 40-1 at 34–35. The Court has no idea what information these files contain, its economic value, or whether it was "ascertainable by proper means." 18 U.S.C. § 1839(3). The only specific example, Barie provides is "contact lists created by Defendant Dowding," which The Walling Company "considers . . . its proprietary work product which must remain on its servers." Filing No. 40-1 at 35. Without knowing what information the contact lists contain (i.e., public information or private insights), and the efforts Dowding took to compile them, The Court cannot say they qualify as a trade secret. *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) (discussing the fact intensive analysis for compilations of public and nonpublic information).

Barie's description of Scott Kesterson's files comes closer. It specifically identifies the following categories of information:

- Bacon Lists: "lists of TWC's top End Users" which "are used to send certain customers bacon as a promotional endeavor." Filing No. 40-1 at 28.

- Final Territory numbers: a spreadsheet "contain[ing] detailed information regarding every sale made by each TWC sales personnel, with dates of invoices, amounts of invoices, the product and amount sold, and other information." *Id.*

- The Price Bible: a "document contain[ing] the pricing information for all TWC's End Users, including markups and margins." *Id.*

- Spreadsheets showing sakes data between 2019 and 2023. *Id.* at 28–29.

Based on Barie's description, it appears The Walling Company has a fair chance of showing that some of these compilations contain information that is not known to the

public, economically valuable, and took significant effort to compile. *AvidAir Helicopter Supply, Inc.*, 663 F.3d at 972. Thus, The Walling Company has a fair chance of showing Scott Kesterson's hard drive contains trade secret information.

### b. Misappropriation of a trade secret.

If there is an actionable trade secret somewhere in the hard drives, The Walling Company's evidence of misappropriation is skinny. Misappropriation includes, among other things, the "disclosure or use of a trade secret of another without express or implied consent who . . . used improper means to acquire knowledge of the trade secret" or "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii). The Walling Company's assertion that the alleged trade secret information on the Dowding and Scott Kesterson hard drives has been disclosed to or used by the Defendants is not supported by the factual record.[16] "Likelihood of success cannot be woven from the gossamer threads of speculation and surmise." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). Here, the metadata shows that the files on the hard drive were not accessed after the end of Scott Kesterson and Dowding's employment. Scott Kesterson attests that the metadata show the files on the hard drive were last accessed in March 2024 when the computer was backed up. Filing No. 47-2 at 4. The Walling Company offers no evidence to rebut this claim, despite having metadata about the copies in question. Moreover, the dates of the files—the newest of which are from 2023—are

---

[16] The Walling Company also claims misappropriation based on information that lives in the former employee's heads and on Daly's old email inbox. As noted *supra* Section II.C.1.a, The Walling Company's overly general approach fails to demonstrate a chance on the merits. So, the Court only focuses on the hard drives.

consistent with Scott Kesterson's backup story.  Filing No. 40-1 at 28–29.  So, the record does not show that Scott Kesterson accessed, used, or disclosed any of the trade secret information on the hard drive after he left The Walling Company.  Likewise, the forensic report on Dowding's hard drive indicates that the files have not been accessed since November 3, 2024—before Dowding joined the Heat Exchanger Group.  Filing No. 50-4.  Beyond this forensic information, Scott Kesterson and Dowding signed sworn statements that they have not disclosed or used these files, have been open about their possession of Walling Company information, and have taken efforts to return the files to The Walling Company.  Filing No. 50-1 at 3–4; Filing No. 47-2 at 10; Filing No. 57; Filing No. 58.  This behavior is inconsistent with the ongoing use of stolen trade secret information.

On the other side of the ledger, The Walling Company points to speculation by its employee that The Heat Exchanger Group is using its trade secrets and its expert's speculation that Dowding could have further transferred files without it showing up on the forensic report.  *See* Filing No. 40-1 at 39–40 (asserting Defendants are using this trade secret information); Filing No. 54-2 at 7.  Specifically, The Walling Company argues that because the former employees have been successful in their sales efforts, they must be using The Walling Company's information.  That is one inference.  Another inference is that the former employees are talented salespeople who know the industry and are well-liked by their clients.  The record right now supports this inference more than The Walling Company's speculation about trade secret use.

The Walling Company's speculation is insufficient to show a likelihood of success on its claim that Scott Kesterson and Dowding misappropriated its trade secrets.

*     *     *

40

The Walling Company has not shown that most of the information contained in its expansive definition of Confidential and Trade Secret information qualifies as a protected trade secret.  For the limited categories of information that may qualify as a trade secret, The Walling Company has offered only speculation of its use and disclosure.  Thus, The Walling Company has not shown a likelihood of success on the merits on its trade secrets claim.

### 2.  Irreparable Harm

Even if hard drives and email folders contain trade secrets Defendants' actions rise to the level of misappropriation, The Court has trouble seeing the irreparable harm.  The forwarded emails were in an email inbox Daly no longer has access to.  The hard drives have been locked in the Defendants' attorneys' offices or with their forensic experts since February.  And, despite taking discovery in state court, The Walling Company has offered only speculation that any Defendant still possesses its trade secret information.  Indeed, at oral argument, counsel for The Walling Company admitted "are they still using [The Walling Company's trade secrets]?  Maybe not.  Probably not."  Filing No. 60, at 66:15–16.  This admission belies its claim for irreparable harm and is fatal to its request for forward looking relief.  If any of Defendants' past actions rise to the level of misappropriating a cognizable trade secret, The Walling Company can recover damages.

### D.  Tortious Interference

The Parties have treated The Walling Company's tortious interference claim as derivative of its contract and trade secrets claims, so the outcome is the same: a mixed record on likelihood of success on the merits and no showing of irreparable harm.

### 1. Likelihood of Success on the Merits

The Walling Company's likelihood of success on the merits is mixed. To succeed on its tortious interference claim, The Walling Company must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted." *Thompson v. Johnson*, 910 N.W.2d 800, 807 (Neb. 2018). Here, the Parties primarily focus on the third element, so the Court does the same. "[V]alid competition, including inducement of third persons to do their business with oneself rather than with a particular competitor, cannot be the basis for a tortious interference claim, because such conduct is justified." *Dick*, 950 N.W.2d at 378 (citation modified).

The Walling Company's tortious interference claim relies on two allegedly unjustified acts: (1) the former employee's solicitation of clients during the term of their noncompetes or while subject to the duty of loyalty, and (2) The Heat Exchanger Group and former employee's use of The Walling Company's trade secret information. On the first theory, The Walling Company is more likely to succeed against Daly—who has an enforceable noncompete—than against Dowding and Scott Kesterson—who do not. *See supra* Section II.A. A theory that the Heat Exchanger Group tortiously interfered with the noncompete agreement between The Walling Company and the former employee breaks down on the same lines. *See Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 444 (Neb. 2015) (unenforceable noncompete fatal to derivative tortious interference claim). Assuming breaching a common law duty of loyalty amounts to "improper means,"

42

The Walling Company has some chance of success on that theory. *See supra* Section II.B.1. Turning to the second theory, The Walling Company is unlikely to succeed on the merits because it has not demonstrated a likelihood of success on its claim that The Heat Exchanger Group or the former employees used The Walling Company's trade secret information. *See supra* Section II.C.1b.

### 2. Irreparable Harm

The irreparable harm analysis is the same as the contract and duty of loyalty claims: The Walling Company's potentially meritorious claims turn on the Defendant's past wrongdoing—not future harm. *See supra* Sections II.A.2 & II.B.2.

### E. Computer Fraud and Abuse Act (CFAA)

The Walling Company's invocation of the CFAA—an anti-computer hacking statute—is foreclosed by the Supreme Court precedent and thus unlikely to succeed on the merits. And, it has not shown that Scott Kesterson is in imminent danger of accessing the files in question, precluding a finding of irreparable harm.

### 1. Likelihood of Success on the Merits

At best, The Walling Company has shown subsequent misuse of documents Scott Kesterson had lawful access to at the time of access. That is not a CFAA violation.

The CFAA is a 1986 statute intended to combat the scourge of computer hacking. *Van Buren v. United States*, 593 U.S. 374, 378 (2021). Relevant here, it creates civil liability for anyone who "intentionally access[es] a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."[17] 18 U.S.C. § 1030(a)(2)(C) (substantive provision); *Id.* § 1030(g) (private

---

[17] "Protected computer" includes "a computer . . . which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

right of action). "Exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Scott Kesterson "exceed[ed] authorized access' [if] he accesse[d] a computer with authorization but then obtain[ed] information located in particular areas of the computer—such as files, folders, or databases—that [were] off limits to him." *Van Buren*, 593 U.S. at 396. The CFAA "does not cover those who have improper motives for obtaining information that is otherwise available to them." *Id.* at 378.

The Walling Company's theory that Scott Kesterson kept email files on his own computer does not support a CFAA claim. The CFAA only applies if—at the time of access—Scott Kesterson was unauthorized to access the computer[18] or "obtain[ed] information located in particular areas of the computer—such as files, folders, or databases—that [were] off limits to him." 18 U.S.C. § 1030(a)(2)(C); *Van Buren*, 593 U.S. at 396. Here, Scott Kesterson obtained the files at issue during his employment from his work email account during his employment. The Walling Company has not identified any information that came from files or databases Scott Kesterson was not allowed to access. And, once the emails were downloaded, he no longer accessed The Walling Company's email server or cloud service to use them. So, at the time he downloaded a copy of his email inbox Scott Kesterson did not access "a computer without authorization or exceed[] authorized access." 18 U.S.C. § 1030(a)(2)(C). The Walling Company's theory that he

---

[18] The nature of The Walling Company's email service (i.e., whether it is cloud-based or locally stored) is unclear on the current record. Either way, it likely qualifies as a "computer" under the CFAA. *See e.g. Taylor Made Express, Inc. v. Kidd*, No. 21 C 2903, 2024 WL 197231, at *8 (N.D. Ill. Jan. 18, 2024) (cloud email service); *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1290 (S.D. Fla. 2020) (an entity's own email server).

downloaded his email to unfairly compete is just an argument that he had "improper motives for obtaining information that is otherwise available to them"—something the CFAA does not cover. *Van Buren*, 593 U.S. at 378.

The Walling Company's backup theory—that Scott Kesterson "continued to access TWC's email server after access was revoked by TWC's IT vendor, Lutz Technologies" — strains credulity. Despite alleging a breach of its system, The Walling Company provides no evidence of activity from Scott Kesterson—be it a login or an email—on its servers. Scott Kesterson is a salesman not an IT professional. There is nothing in the record suggesting he has the skill or experience necessary to hack into The Walling Company's system. And, even on its own terms, The Walling Company's theory makes no sense. Factually, what would Scott Kesterson gain by sending a partial email with his Heat Exchanger Group signature to a Heat Exchanger Group client from his Walling Company email address? Legally, what "information" did Scott Kesterson "obtain" by sending these emails? Scott Kesterson's version of events—that his email application associated a draft email with the wrong account—is consistent with the record and makes more sense. The Walling Company is unlikely to succeed on its fanciful "computer hacking" theory.

The Walling Company has not shown a likelihood of success on its CFAA claim.

## 2. Irreparable Harm

Nor has The Walling Company shown irreparable harm. Again, "[t]he purpose of a preliminary injunction is not to remedy past harm." *Miller*, 9 F.4th at 1015. Here, the email files are located on a device locked in Scott Kesterson's lawyer's office. And he is currently in his eighth month of trying to return these files to The Walling Company. The Walling Company has shown no evidence that Scott Kesterson will take back his device.

Nor has it shown that he is at imminent risk of hacking back into the system. Overall, The Walling Company has not shown any future harm to enjoin flowing from its CFAA claim.

### F. Stored Communications Act

The Walling Company is unlikely to succeed on its equally expansive view of the SCA. Specifically, there is no evidence suggesting that Scott Kesterson "obtained, altered, or prevented access to" *any* electronic communication "while in electronic storage." 18 U.S.C. § 2701(a). Even if The Walling Company's theory held water, the email inbox in question is located on a device that has been locked away from Scott Kesterson for months—cutting against irreparable future injury.

#### 1. Likelihood of Success on the Merits

The Walling Company has not shown Scott Kesterson's actions fit within the narrow class of actions covered by the SCA.

The SCA extends wiretapping protections to email. *Hately v. Watts*, 917 F.3d 770, 782–84 (4th Cir. 2019) (recounting the legislative history). Specifically, it creates a private right of action "against anyone who 'intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system[.]'" *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 839 (8th Cir. 2015) (quoting 18 U.S.C. § 2701(a)(1)); 18 U.S.C. § 2707 (private right of action). Here, the "electronic storage" issue is dispositive, so the Court need not address Scott Kesterson's other arguments.

"[The 'electronic storage'] requirement is commonly misunderstood because the statutory definition of 'electronic storage' is much narrower than its name suggests." *Id.*

(quoting William Jeremy Robison, *Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act*, 98 Geo. L.J. 1195, 1206 (2010)). "Electronic storage" means "(1) "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," or (2) "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.* (quoting 18 U.S.C. § 2510(17)). The Walling Company appears to rely on the first category. This category applies to "electronic communications stored 'for a limited time' in the 'middle' of a transmission, i.e. when an electronic communication service temporarily stores a communication while waiting to deliver it." *Id.* (quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001)); *see also United States v. Councilman*, 418 F.3d 67, 81 (1st Cir. 2005) (en banc) ("The first category . . . refers to temporary storage, such as when a message sits in an e-mail user's mailbox after transmission but before the user has retrieved the message from the mail server."). Here, The Walling Company has shown no evidence that Scott Kesterson accessed unopened emails from its mail server. As discussed supra Section II.E.1., its hacking theory is not supported by the evidence. This means, at best, Scott Kesterson downloaded the emails in question from the server to his personal machine and used them after his employment ended. So, any "unauthorized" access did not occur while the emails were unopened in "electronic storage" and the SCA does not reach Scott Kesterson's conduct. 18 U.S.C. § 2701(a).

## 2. Irreparable Harm

The Walling Company has not shown irreparable harm on its SCA claim for the same reasons discussed, supra Section II.E.2.

### III.    Balance of the Equities (All Claims, All Parties)

The balance of the equities favors the Defendants.  On this point, The Court "weigh[s] 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties.'"  *MPAY Inc.*, 970 F.3d at 1020 (quoting *Dataphase Systems, Inc.*, 640 F.2d at 113).  Here, as discussed ad nauseum, The Walling Company has not shown irreparable harm.  On the other side of the ledger, The Walling Company's requested injunction would bar Defendants from doing business in their industry of choice and impose heavy economic costs.  Simply put, the equities here do not overcome The Walling Company's weak case on the merits and failure to show a threat of irreparable harm.

### IV.    The Public Interest (All Claims, All Parties)

Having concluded The Walling Company is unlikely to succeed on the merits of its claims and has not shown irreparable harm, issuing an injunction that restrains trade is not in the public interest.  *Gaver*, 856 N.W.2d at 127; Neb. Rev. Stat. § 59-1603.  This factor favors the Defendants.

The duty of loyalty claim requires special attention here.  Imagine if the Court were to issue a forward-looking injunction based on a past breach of the duty of loyalty by a former employee.  Recall, restraints on trade are disfavored but allowed when the parties negotiate a specific, narrowly drawn contract provision. *Gaver*, 856 N.W.2d at 127.  The Walling Company's theory—if adopted—would imply this kind of disfavored restraint of trade in every employment relationship.  In this world, rather than negotiate or draft a valid noncompete, the employer could simply run to court and get a yearlong noncompete by

asking for a preliminary injunction.  This extreme and disruptive result counsels against the relief sought by The Walling Company.

*      *      *

Some of the issues here are complex but the bottom line is simple: The Walling Company is not entitled to a preliminary injunction.

## V.    Loose Ends

Two loose ends remain: (1) The Walling Company's Motion to Strike, and (2) whether to maintain Filing Nos. 43 and 55 under restricted access.

### A.  The Walling Company's Motion to Strike

The Walling Company moves to strike Exhibit F (Filing No. 50-5)—a Rule 11 communication from Dowding, Daly, and McKnight's counsel.  Fed. R. Civ. P. 11 provides that a motion for sanctions "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service."  Here, the employees served their Rule 11 Motion on July 2, 2025, meaning The Walling Company had until July 23, 2025, to withdraw or correct the challenged claim.  So, The Walling Company has a point that defendants "presented" the Rule 11 communication "to the court" prematurely.  But, while the preliminary injunction motion was pending, the 21-day clock ran, without any withdrawal of or amendment to The Walling Company's papers.[19] So, although the initial submission was improper, the legal deficiency was fixed by the passage of time.  Moreover, the Rule 11 communication

---

[19] Fed. R. Civ. P. 11(c)(2) further provides that "[a] motion for sanctions must be made separately from any other motion." So, the Court expresses no view on the merits of the legal claims articulated in Filing No. 50-5 and will take no further action on this issue.

49

did not inform the Court's analysis.  Therefore, the proper course is to deny the motion to strike as moot.

**B.  Continued Restriction of Filing No. 43 and Filing No. 55.**

The Walling Company filed certain documents under restricted access.  *See* Filing No. 43; Filing No. 55.  Magistrate Judge Carson granted the motion to restrict, subject to reconsideration after the Court resolved the merits of the preliminary injunction motion.  Filing No. 45.  "There is a common-law right of access to judicial records."  *IDT Corp. v. eBay*, 709 F.3d 1220, 1222 (8th Cir. 2013).  "Where the common-law right of access is implicated, the court must consider the degree to which sealing a judicial record would interfere with the interests served by the common-law right of access and balance that interference against the salutary interests served by maintaining confidentiality of the information sought to be sealed."  *Id.* at 1223.  The public's interest is at its apex for "matters that directly affect an adjudication" or, in other words, play a part in the Court's "exercise of Article III judicial power" and its nadir for "matters that come within a court's purview solely to insure their irrelevance."  *Id.* at 1223–24 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).  Here, the restricted documents are: (1) the employee handbook, (2) the Defendants' employment contracts, and (3) the business plan.

Start with The Walling Company's confidentiality interest.  The Walling Company's justification for restricting access is that these documents contain "confidential, proprietary, and trade secret information."  Having reviewed the documents, The Court does not see it.  The Employee Handbook contains boilerplate company policies that could apply to any business—not The Walling Company's competitive strategy or

50

carefully curated customer insights.[20] Likewise, the employment contracts reference confidential information as a concept, but otherwise contain standard contractual terms. And, as discussed *supra* Section II.C.1.a, the business plan contains publicly available information about A.R. Wilfley & Sons and the Heat Exchanger Group along with business truisms—not protected trade secrets. So, The Walling Company's confidentiality interests are minor.

By contrast, the public's interest is weighty. The public has a heightened interest in "matters that directly affect an adjudication" because accessing "material at issue in the exercise of Article III judicial power" is valuable for "monitoring the federal courts." *IDT Corp.*, 709 F.3d at 1223–24 (*quoting Amodeo*, 71 F.3d at 1049–50). Here, the Court cited to each exhibit to resolve The Walling Company's preliminary injunction motion. The Court quoted from the terms of the employee handbook to decide whether it was a contract. The Court engaged in an extended discussion of the terms of the employment contracts, quoted from them at length, and decided if their terms were valid. Likewise, the Court discussed the content of the business plan in detail to decide whether it qualified as a protected trade secret. For the public to decide whether the Court did a good job in denying the motion for preliminary injunction, it would need to understand the contents of these documents.

"When [litigants] call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials. Judicial proceedings are public rather than private property, and the third-party effects that justify the subsidy of the judicial system also justify making records and decisions as open as

---

[20] For example, it would be absurd to say a "competitor[]" would gain "an unfair advantage against it by exploiting" The Walling Company's sick leave, antidiscrimination, or workplace safety policies.

possible." *Union Oil Co. of California v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).  Here, the public's interest in the work of the courts outweighs The Walling Company's confidentiality interests.  So, continued restriction is not justified.  Out of an abundance of caution, within 30 days of this order, The Walling Company may submit proposed redactions explaining—with specificity—the justifications for those redactions. If no proposed redactions are submitted within 30 days, Filing Nos. 43 and 55 will become public.

## CONCLUSION

This is a messy business dispute.  Clearly, The Walling Company feels wronged by its former employees. But The Walling Company has not shown is has a fair chance of succeeding on most of its legal claims.  And—in part because it waited eight months to seek an injunction—the harm to The Walling Company is in the past, not the future.  So, the Court declines to enter a preliminary injunction. If The Walling Company ultimately succeeds on any of these claims, it can recover damages.

At the end of the day, the real dispute here is over when and how the defendants will return The Walling Company's documents. The Court refers this case to mediation to give the parties a chance to peacefully resolve this issue and, hopefully, this litigation in light of this order.

THEREFORE, IT IS ORDERED:

1.  The Walling Company's Motion for Preliminary Injunction (Filing No. 37) is denied.

2.  The Walling Company's Motion to Strike (Filing No. 56) is denied as moot.

3. Within 30 days, The Walling Company may submit proposed redactions to Filing No. 43 and Filing No. 55 along with a motion justifying each redaction. The Magistrate Judge will decide, what redactions, if any are appropriate. If no motion is filed, the Clerk is directed to remove the restricted designation from Filing No. 43 and Filing No. 55.

4. The Parties are referred to mediation. Within 14 days of this order, the Parties shall submit a joint status report identifying the mediator. If the parties cannot agree on a mediator, the Court will select one. Within 7 days of mediation, the Parties shall submit a joint status report identifying what issues, if any, remain for the Court to resolve.

Dated this 18th day of August, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge